PAUL v. PACIFIC R. CO.    See Cases Nos. 10,767 and 10,768.

## Case No. 10,845.

### PAUL v. PACIFIC R. CO. et al.    PARMELY v. IRON MOUNTAIN R. CO.    BAILEY v. ATLANTIC & P. R. CO.

[4 Dill. 35; [1] 3 Cent. Law J. 306.]

Circuit Court, E. D. Missouri.    April, 1876.

POWERS OF MISSOURI STATE BOARD OF EQUALIZATION—EFFECT OF ACTING ULTRA VIRES—OVER-VALUATION OF PROPERTY — INJUNCTION AGAINST COLLECTION OF ILLEGAL TAXES.

1. A statute of Missouri [Laws 1852–53, p. 13], provided that the state board of equalization "shall proceed to adjust and equalize the aggregate valuation of the property of each one of the railroad companies liable to taxation under the provisions of this act:" Held, that this only authorized the board to equalize the aggregate valuation of the county boards, and did not give them power to act as an original assessing body, and make an assessment de novo.

[Cited in brief in City of Kansas v. Hannibal & St. J. R. Co., 81 Mo. 287.]

2. Although to make an assessment de novo would be an act beyond the power of the board, and void, this would not vitiate the entire tax, but would leave the final valuation as fixed by the county boards.

3. The companies were required to pay taxes on the valuation fixed by the county boards, and the collecting officers were enjoined only in respect of the excess over such valuation.

4. A mere error of judgment on the part of the assessing officers, as to the valuation of property, is not, in the absence of fraud, subject to judicial revision. The charge of fraud made against the state board of equalization not sustained by the proofs.

[Bills by Amos Paul against Pacific Railroad Company, Duncan S. Parmely against St. Louis, Iron Mountain & Southern Railroad Company, and Ozias Bailey against Atlantic & Pacific Railroad Company.] These bills in equity were filed for an injunction and relief against taxes assessed for the year 1873, upon the property of the Pacific and certain other railroads in the state of Missouri. Temporary injunctions were allowed on certain conditions; for reasons which were stated at the time, and which will be seen by Parmely v. St. Louis, I. M. & S. R. Co. [Cases Nos. 10,767 and 10,768. See, also, Case No. 732.] The issues having been made up, and the proofs taken, the causes were submitted for final decrees.

---

[1] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

Mr. Baker, Mr. Lowe, Mr. Dryden, and Mr. Sears, and others, for plaintiffs.

Mr. Bowman and others, for the counties.

DILLON, Circuit Judge, in disposing of the cases, delivered an oral opinion, substantially as follows:

These cases concerning railroad taxes, which we have had before us for some time, were, at the outset, and perhaps are still, very important.

Bills were originally presented to me for the granting of temporary injunctions. After hearing the parties, I allowed temporary injunctions until the term when the supreme court justice allotted to this circuit—Mr. Justice MILLER—was to be here, at which time we had a very full argument before all three of us, Judge TREAT sitting at our request. It is not necessary to go into all that was said and done at that time. The result of it was this: That, after hearing the counsel fully for two or three days on each side, we made our order, requiring these companies to pay what amounted to about sixty per cent of the taxes which were claimed against them, meanwhile continuing the temporary injunctions, but with a provision that if this amount was not paid the injunctions should stand dissolved, leaving the state and the various counties and municipalities free to use the ordinary remedies for the collection of their taxes. Parmley v. St. Louis, 1. M. & S. R. Co. [Cases Nos. 10,767 and 10,768]. In respect of the Atlantic & Pacific and the Missouri Pacific Railroads, there were special grounds of exemption from taxation claimed, on which the court ruled against them, leaving the cases against those companies and the other companies to stand on ground common to all, as far as they could stand at all. The views which the court took of those special exemptions have, since that time, been settled by the United States supreme court, in conformity with our judgment against the companies, to the effect that they have no special legislative contract for exemption from the particular taxes here in controversy.

The main ground-work of the bills was the alleged fraudulent conduct of the state board of equalization, and also the alleged attempt of that board to exercise powers not conferred upon it by the statute. The companies also complained loudly of the excessive nature of these assessments.

In this state each railroad company is required to make a list of its property, and to affix a value to it. These lists are transmitted to the counties, and there is a county board established, whose duty it is "to examine the statement furnished them by the officers of the company, and determine the correctness thereof, as to the amount of property and the valuation thereof." The companies complied with this provision, and transmitted their descriptive lists and their valuation to the various counties. In some instances the valuations were accepted by the counties, but in most cases they were raised, as, for example, in the case of Pettis county. The value of the railroad property in that county, as returned by the officers of the company, amounted to $300,260; as increased by the county court, it amounted to $533,000—nearly double; and, in general, the counties went over those lists returned by the companies, and very largely increased the specific valuations, and the aggregate amounts returned. Another provision of the law is that this valuation, as fixed by the county court, shall be transmitted to the central authority, at Jefferson City, that is, to the state board of equalization; and that board, for the year the taxes of which are in dispute here, was constituted of the state senate. Now, the result of the action of that body was very largely to increase the valuations fixed by the county courts; and the printed record of their proceedings shows that they conceived it to be their duty to investigate this matter very fully, and to examine witnesses. The result was that they increased largely the valuations. In the case of the Missouri, Kansas & Texas Railroad, the valuation was increased from $8,000 or $9,000 a mile to $26,000 a mile. The bill alleged that this valuation was largely over what it had ever been before; that although the condition of the property was nearly the same, the assessment was double, in round numbers, what it was the preceding year; and a supplemental showing has been made to the effect that it was double what it was the next year; and that altogether this is a very extraordinary and most exceptional valuation, without anything like it before or since. The railroad companies imputed this in their bills to a disposition, intention, and purpose, on the part of the senate, acting as a state board of equalization, to discriminate against property of this class, and to make it bear, in violation of the constitution of the state, more than its proportionate share of the public burdens. A great deal of evidence has been produced here for the purpose of showing that, in general, other property throughout the state is valued at from fifty to sixty or sixty-six per cent of its actual value, whereas the valuation placed by the state board of equalization on this railroad property is not only equal to, but in excess of, its full value, and the distinct charge is made in the bill that this was done from a premeditated design to make this property contribute more than its share of the public burdens.

A large amount of evidence has been taken on that point. We have gone over that evidence, and while we cannot say that the result is, in our minds, quite clear that these valuations, relatively considered, are not excessive, yet we are of opinion that a mere error in judgment, on the part of any body of this kind, in fixing the valuation of property, is not subject to judicial revision or con-

trol; and if the bill could rest on no other ground it would have to be dismissed. In other words, the charge of fraud, which is made against this body, is not sustained.

That leaves simply a question whether this body was acting in excess of the rightful jurisdiction conferred upon it by the statute. The claim on the part of the complainant is that the statute then in force—for in this regard it has since been amended, and the same question cannot again arise—created the state board of equalization, with only the power to equalize taxes, that is, to equalize the aggregate valuation. It is acknowledged that they have the power to do that, but it is denied that the statute gave them the power to act as an original assessing body, to go over all the railroads of the state and ascertain their property, and make an original assessment, de novo, based on the value of the specific articles which compose the property of these companies.

Now, it is a question of law as to what powers were conferred on that body by the statute of 1873. The question of fact is whether, if that body had only the powers of a board of equalization, they undertook to exercise the powers of an assessing body. The statute is this: "The said board shall proceed to adjust and equalize the aggregate valuation of the property of each one of the railroad companies, liable to taxation, under the provisions of this act,"—"shall proceed to adjust and equalize the aggregate valuation." "The board shall have power to summon witnesses, by process issued to any officer authorized to serve subpœnas, and shall have the power of a circuit court to compel the attendance of such witnesses, and compel them to testify; they shall have power to increase or reduce the aggregate valuation of the property of any railroad company included in the statements or returns made by the railroad companies and clerks of the county courts, and any other property belonging to said railroad companies which may be otherwise known to them, as they may deem just and right."

Since that time a statute has been passed by the legislature of Missouri inserting, in addition to these words, the power to "assess," but that statute has no relation to this controversy. This question was very elaborately argued before the full bench when Mr. Justice MILLER was here, and although, I believe, nothing very positive was stated about it in the remarks which were made, and no definite conclusion was announced, we reached quite a satisfactory one, which was that the law limited the functions and powers of this body to the work of equalizing, and that they had not the functions and powers of an original assessing body; and upon further reflection, that is still our judgment. This makes it necessary to consider whether what the state board of equalization did was an adjustment and equalization of values, or whether it was an original assessment.

Judge TREAT and myself have gone through the evidence in this respect and have not reached a conclusion exactly in accord. Judge TREAT is of opinion that what they did can be reconciled with a fair view of simply adjusting and equalizing the aggregate valuations. I am of opinion, taking the whole of that evidence together, that this body undertook to make, and did make, a specific assessment of this property—undertook to inquire originally, and did inquire originally, into the value of each locomotive, sleeping car and freight car, the value of lands and of all specific property, just as fully and completely as they could have done had they been undertaking to assess it originally; and, indeed, while this is charged in the bill, the answer hardly denies it, but, on the contrary, asserts in terms, whether meant to do so or not, that they did assess it, and that their assessment was just. So, taking the pleadings and the proofs together, I am of opinion that they did undertake to make, and did make, an original assessment.

Now, this being so, what is the result of it? The result is that they were acting ultra vires. It was contended on the argument before us, by the companies, that this would have the effect of vitiating the entire assessment, and that no tax at all could be collected, and it has since been pressed upon us that that is the true view of the matter; but that was settled at the other argument. We held then, under the circumstances of the case, that this did not have the effect to vitiate the whole proceeding, but that, if they undertook to do what they had no authority to do, it would be just the same as if they had not done it at all; that the valuations as fixed by the county courts would be the true valuations in the premises, and that these companies must pay taxes on the valuations for this year as fixed, not by themselves, but by the county courts of the respective counties. And that will be the decision now. If it becomes necessary to refer this to a master in order to ascertain what those valuations are, we will make that reference, and, perhaps, it would be better to have a master, if the case is going to remain so that the amounts due, on this basis, can be ascertained and required to be paid or collected. There will be no injunction, except for the excess over the amounts fixed by the county courts.

I am the more reconciled to this view, because, in my judgment, it affects an equitable result. It cannot be said that the state is not getting its full share of revenue, if these companies are required to pay, in the absence of any valid action on the part of the state board of equalization, on the value as fixed by the several counties in which this property is situated. That makes it about the same amount the companies paid the year before, and a showing supplemental has been made, that the taxes for the year afterward were assessed and paid on just

about the same valuation. There is no reason to suppose that these roads were worth twice as much in 1873 as they were the following year; and, from the evidence, the extent of this assessment is shown by a comparison of the percentage of taxation imposed by this action with that imposed on other railroads elsewhere, which may be presumed to be not far from the same value. Of course this is only a comparison of the taxes with the net earnings. The assessment on the Chicago & Northwestern Railroad is 8 65-100 per cent; on the Chicago, Rock Island & Pacific, 4 91-100, or about five per cent; on the Chicago, Burlington & Quincy, 5 76-100, or about six per cent; on the Lake Shore & Michigan Southern, 10 80-100 per cent; on the Illinois Central, 4 60-100 per cent; and on the Missouri, Kansas & Texas for 1873, the year here in question, it was 38 73-100 per cent.

The judgment of the court is that the injunctions may remain to restrain the collection of taxes in excess of the amount fixed in the aggregate, by the various county courts, through which the roads run.

Ordered accordingly.

NOTE. Upon the announcement of the foregoing opinion, Mr. Bowman, counsel for the state and counties, said that they acquiesced in the decision of the court, and, upon his motion, the cases were referred to a master to carry into effect the order of the court; and the court ordered those roads in the hands of its receivers at once to pay the taxes due from them on the above basis.

We append a report of the rulings of Treat, J., in Ketchum v. Pacific R. Co. [Case No. 7,-738], in the circuit court for the Eastern district of Missouri, September, 1876.

[The case reported as a note to this case in 4 Dill. 41, is here published as Case No. 7,738.]